

FILED

FEB - 7 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

DAVID I. GLOVER,

        Plaintiff,

    v.

RICHARD J. HRYNIEWICH
and
THE CITY OF NORFOLK, VIRGINIA

        Defendants.

Civil Action No. 2:17cv109

---

TIMOTHY B. PRIDEMORE,

        Plaintiff,

    v.

RICHARD J. HRYNIEWICH
and
THE CITY OF NORFOLK, VIRGINIA

        Defendants.

Civil Action No. 2:17cv110

## OPINION & ORDER

    This matter is before the Court on several outstanding motions in Glover v. Hryniewich et al. (2:17cv109) and Pridemore v. Hryniewich et al. (2:17cv110). According to the Court's records, the following motions are ripe for decision:

- Motion for Summary Judgment by Richard J. Hryniewich ("Hryniewich"), Doc. 90 (2:17cv109), Doc. 78 (2:17cv110);

- Motion for Res Judicata by Hryniewich, Doc. 147 (2:17cv109), Doc. 135 (2:17cv110);

- Motion for Summary Judgment by the City of Norfolk ("City"), Doc. 152 (2:17cv109), Doc. 140 (2:17cv110);

- Motion for Summary Judgment by SAFE Boats International, LLC ("SBI"), Doc. 99 (2:17cv109), Doc. 87 (2:17cv110);

- Motion to Exclude Third-Party Plaintiffs' Expert by SBI, Doc. 92 (2:17cv109), Doc. 80 (2:17cv110);

- Motion to Withdraw as Attorney by SBI, Doc. 151 (2:17cv109), Doc. 139 (2:17cv110);

- Motion to Amend / Correct Scheduling Order to Extend Deadline for De Bene Esse Depositions by SBI, Doc. 160 (2:17cv109), Doc. 148 (2:17cv110);

- Motion for Leave to File its Fourth-Party Complaint ("Rule 14 Motion") by Willard Marine Inc. ("Willard"), Doc. 67 (2:17cv109), Doc. 61 (2:17cv110);

- Motion to Add a Necessary Party ("Rule 19 Motion") by Willard, Doc. 69 (2:17cv109), Doc. 64 (2:17cv110);

- Motion to Stay by the City, Doc. 167 (2:17cv109), Doc. 154 (2:17cv110).

For the reasons stated herein, the Court **CONSOLIDATES** the cases for all further proceedings. Furthermore, the Court **RULES** as follows on the remaining motions: (1) **GRANTS** Hryniewich's Motion for Summary Judgment; (2) **DENIES** the City's Motion for Summary Judgment; (3) **DENIES** Hryniewich's Motion for Res Judicata as **MOOT**; (4) **RESERVES RULING** on SBI's Motion for Summary Judgment; (5) **RESERVES RULING** on SBI's Motion to Exclude; (6) **GRANTS** SBI's Motion to Withdraw as Attorney; (7) **GRANTS** SBI's Motion to Amend / Correct Scheduling Oder to Extend Deadline for De Bene Esse Depositions; (8) **RESERVES RULING** on Willard's Rule 14 and 19 Motions; (9) **GRANTS** the City's Motion to Stay. The Case is hereby **STAYED** until further order of the Court.

## I. PROCEDURAL HISTORY

On March 21, 2016, Plaintiffs ("Glover and Pridemore") each filed a complaint against the City of Norfolk ("City") and Hryniewich (collectively, "City Defendants") in Norfolk Circuit

Court ("State Actions"). Doc. 6, Ex. 1.[1] City Defendants responded with Pleas in Bar in the State Actions and Plaintiffs filed Motions to Strike Defendants' Pleas in Bar. Id. at 2. On December 16, 2016, the Norfolk Circuit Court denied Plaintiffs' Motions to Strike. Doc. 7 at 3.

On February 23, 2017, Plaintiffs filed the instant Complaints in this Court ("Federal Actions"). They allege negligence and gross negligence on the part of the City and Hryniewich individually. Doc. 1.

On March 6, 2017, the Court ORDERED that the Federal Actions be consolidated for discovery purposes only. Doc. 4 at 1. On April 21, 2017, Defendants filed a Motion to Dismiss or Stay Pursuant to Rule 12(b)(1) ("Motion to Dismiss"). Doc. 5. On August 4, 2017, the Court GRANTED the Motion to Dismiss in part, and stayed the Federal Actions pending a Norfolk Circuit Court ruling on whether sovereign immunity was available to City Defendants in the State Actions. Doc. 11.

By letter opinion dated August 18, 2017, the Norfolk Circuit Court found that the City was engaged in a governmental function at the time of the alleged negligent incident. Therefore, the court held that the City was entitled to sovereign immunity under Virginia law. See Doc. 12, Ex. A at 1. The Norfolk Circuit Court further held that Hryniewich was entitled to sovereign immunity for Plaintiffs' simple negligence claims, but not for their gross negligence claims. Id. Given the Norfolk Circuit Court's finding of sovereign immunity, this Court found that abstention was inappropriate and denied Defendants' Motion to Dismiss. Doc. 13.

On October 31, 2017, Hryniewich and the City filed Third-Party Complaints against Willard. See Doc. 26 (Hryniewich's Complaint); Doc. 28 (City's Complaint). The Complaints allege that the contract between the City and Willard ("Contract") "required Willard to obtain

---

[1] Because filings in case numbers 2:17cv109 and 2:17cv110 are in all material respects identical, this Order and Opinion will cite to documents in case number 2:17cv109.

workers' compensation, commercial general liability, and umbrella/excess liability insurance naming the City as an additional insured." Doc. 28 at 4. "The Contract required this insurance to cover the City and its Sea Trial representatives for all aspects of the Contract work," and "would have provided for the City's defense, and for the defense of Officer Hryniewich, and covered any liability incurred by the City (directly or on behalf of Officer Hryniewich) in the instant suits and the State Actions up to $2,000,000." Id. The City alleges that, "upon information and belief," Willard failed to secure excess or umbrella liability insurance and thus materially breached the Contract. Id. Hryniewich also alleges Breach of Contract to Procure Insurance, and states that "[a]s the City's Sea Trial representative, [he] was an intended third-party beneficiary of the Contract's Insurance Requirements clause." Doc. 26 at 4. City Defendants request indemnity for "any judgment, verdict, or settlement" in the state and federal suits relating to this matter, and "attorneys' fees and costs incurred" in defending the state and federal suits. Id. at 5; Doc. 28 at 5.

The same day, City Defendants filed Third-Party Complaints against SAFE Boats International, LLC ("SBI"). Doc. 27 (Hryniewich's Complaint); Doc. 29 (City's Complaint). The City purchased a 27-foot aluminum hull vessel ("MARINE 5" or "Vessel") from SBI in 2007. Doc. 29 ¶ 5. City Defendants allege that SBI: (1) failed to include a copy of the boat operator's handbook with the purchase, id. ¶ 11; (2) sold MARINE 5 in "an unreasonably dangerous condition by failing to provide engine power limitations that would allow the vessel to execute turns that are an ordinary party of her mission," id. ¶ 36; and (3) failed to exercise reasonable care to ensure City Defendants were aware of the risk that MARINE 5 would capsize during a high-speed turn, id. ¶ 37. Accordingly, City Defendants assert claims against SBI for: general maritime products liability (Count I); strict products liability (Count II); breach of express warranty (Count III); breach of implied warranty of merchantability (Count IV); and breach of implied fitness for a

particular purpose (Count V). See generally id. City Defendants seek indemnity for any liability they may incur for the accident.

On March 22, 2018, Defendants filed a Notice informing the Court that two (2) issues had been certified for interlocutory appeal to the Supreme Court of Virginia in the State Actions: (1) the Norfolk Circuit Court's grant of sovereign immunity for the City in a general maritime law case, and (2) that court's denial of qualified immunity to Hryniewich. Doc. 56. Shortly after the Court denied Defendants' Motions for Judgment on the Pleadings. Doc. 60. In that order, the Court held that the City was not entitled to sovereign immunity. Id.

On July 20, 2018, Willard filed: (1) a Motion for Leave to File Its Fourth-Party Complaint, Doc. 67; (2) an alternative Motion to Add Necessary Party, Doc. 69; and (3) a Motion to Stay the case with respect to Willard, Doc. 65. The Court GRANTED Willard's Motion to Stay and RESERVED RULING on the remaining motions on October 5, 2018. Doc. 108. For orderly disposition of the case, the Court further STAYED the case against SBI. Doc. 107.

Defendant Hryniewich filed a Motion for Summary Judgment on September 11, 2018. Doc. 90. Third-Party Defendant SBI filed a Motion for Summary Judgment on September 28, 2018. Doc. 99. On September 21, 2018, SBI filed a Motion to Exclude Third-Party Plaintiffs' Expert. Doc. 92. The motion became ripe on August 12, 2019. On October 29, 2018, this Court ORDERED that the case be continued pending the resolution of the interlocutory appeal to the Virginia Supreme Court regarding, inter alia, sovereign immunity. Doc. 115.

Plaintiffs filed the Motion to Set Trial on July 18, 2019. See Doc. 119. The Court at a hearing on September 19, 2019, DENIED the Motion to Set Trial and STAYED the Case pending a ruling from the Norfolk Circuit Court on whether Hryniewich was entitled to qualified immunity for gross negligence. See Doc. 143. On November 4, 2019, the parties filed a Joint Status Report

informing this Court that the Norfolk Circuit Court determined that Hryniewich is entitled to federal qualified immunity. See Doc. 144-1 at 13. Additionally, Norfolk Circuit Court stated that the plainly incompetent doctrine or the state-created danger doctrine did not serve to overcome Officer Hryniewich's immunity. Id. Because of the Norfolk Circuit Court's ruling, Hryniewich has filed a Motion to Dismiss for Res Judicata on November 15, 2019. Doc. 147. The Court held a hearing on November 21, 2019 where the Court GRANTED summary judgment to Hryniewhich and took the other motions under advisement. After this hearing, the City filed its Motion for Summary Judgment. Doc. 152. Additionally, SBI has filed its Motion to Amend / Correct the Scheduling Order to Extend Deadline for De Bene Esse Depositions. Doc. 160. The Court held a hearing on January 15, 2020 and heard argument on both the City's Motion for Summary Judgment and SBI's Motion to Amend / Correct the Scheduling Order.

## II. CASE CONSOLIDATION

Pursuant to Federal Rule of Civil Procedure 42, a court may consolidate two actions if they "involve a common question of law or fact." Fed. R. Civ. P. 42. On March 6, 2017, the Court ordered that the Federal Actions be consolidated for discovery purposes only. Doc. 4 at 1. Since that time, the briefing in both cases has been virtually identical, and no reason to maintain the cases separately has emerged. Given the factual and legal overlap between the cases, and for the sake of judicial economy, The Court hereby **CONSOLIDATES** cases 2:17cv109 and 2:17cv110 under 2:17cv109 for all further proceedings, including trial.

## III.    HRYNIEWICH AND CITY'S MOTIONS FOR SUMMARY JUDGMENT

### A. Undisputed Facts[2]

On January 21, 2014, the City issued a purchase order to Willard "for the modification and repair of the City's 27 foot aluminum hull SAFE Boat vessel." Doc. 1 ("Compl.") ¶ 6; Doc. 18 ("City's Answer") ¶ 6. On February 6, 2014, the City issued an additional purchase order to Willard to replace the engines and hydraulic steering system of the Vessel. Doc. 91 at 2-7 ("DSOF") ¶ 2; Doc. 96 at 2. The Contract consisted of Willard's bid and two purchase orders the City issued to Willard, Purchase Order Nos. PC 000021464 and PC 000021545 ("Purchase Orders"). Compl. ¶¶ 2, 6-9; Answer ¶¶ 2, 6-9; see Doc. 153-1. The Purchase Order recites that the work was funded by the "2011 Port Security Grant Program". Doc. 153-1. The City's purchases of the Vessel and others like it were funded through a port security grant provided through the U.S. Department of Homeland Security, as part of changes to port security policy following the terrorist attacks of September 11, 2001. Felix Dep. 12:11-20, Doc. 153-3; Huffman Dep. (Jan. 16, 2018) [hereinafter, "Huffman Dep. II"] 66:4-9, 241:23-242:16, Doc. 153-4; The upgrades to the Vessel's engines under the Contract were funded through a port security grant provided through the U.S. Department of Homeland Security. Huffman Dep. (May 25, 2017) [hereinafter, "Huffman Dep. I"] 69:20-70:4, Doc. 153-5; Huffman Dep. II at 95:24-99:22, 101:7-17, 102:19-103:2, 103:24-104:12, 112:8-16, 225:10-20; Poch Dep. 19:4-15, 143:23-144:14, Doc. 153-6.

The Norfolk Harbor Patrol works with the U.S. Coast Guard and Navy to help provide security to state and federal assets in the waters around Norfolk. Hryniewich Dep. (Apr. 18, 2017) [hereinafter, "Hryniewich Dep. I"] 12:2-15 (in response to question about the purpose

---

[2] These are the undisputed facts the Court will adopt for purposes of deciding both Officer Hryniewich and the City's Motions for Summary Judgment.

of the Harbor Patrol, testifying, <u>inter alia</u>, that "[a] lot increasingly over the years what we have been asked to do by the federal government is to provide security components with the [C]oast [G]uard, escorts of high value assets, Navy carriers, Navy submarines, cruise ships, liquid natural gas, liquid propane ships."), 102:24-104:4 (describing Harbor Patrol's operations with and under the command of Coast Guard); Huffman Dep. I at 25:14-26:2 (exercises with Navy), 43:9-20 (same), Doc. 153-7; Huffman Dep. II at 146:15-22 (the Vessel was used to help protect aircraft carriers); Pratt Dep. 66:4-25 (City's vessels augmented Navy by escorting its vessels), 67:19-68:4 (training with Navy), Doc. 153-8; Squyres Dep. 39:6-13 (City's vessels supported Coast Guard missions), Doc. 153-9; Hryniewich Dep. (Jan. 15, 2018) [hereinafter, "Hryniewich Dep. II"] at 147:2-149:7 (describing Harbor Patrol's role in regional maritime security operations under Coast Guard command), 154:1-156:1 (same),[3] 177:4-14 (participation in search and rescue operations under Coast Guard command), 205:22-206:12 (Harbor Patrol is required by Coast Guard to check on "critical areas" daily), 207:14-23 (members of Harbor Patrol are oncall twenty-four hours to respond to Coast Guard requests), Doc. 153-10; Pagan Dep. (Apr. 18, 2017) [hereinafter, "Pagan Dep. I"] 21:17-22:5 (escorting Navy vessels), Doc. 153-11. The City chose to upgrade the Vessel's engines specifically to enhance its performance in its vessel escort mission, in which it was responsible for operating under the command of Coast Guard officers while protecting U.S. Navy vessels, cruise ships, and other high value targets from potential terrorist attacks. Poch Dep. 23:12-25:17, 26:16-27:9, 170:7172:25; <u>see also</u> Hryniewich Dep. I 29:19-30:16 (in addition to practicing turns like the one he was executing at the time of the Accident, Officer Hryniewich executed similar turns "[o]ut of necessity probably . . . ten times during high-value vessel escorts . . . . [w]hile

_____

[3] Officer Hryniewich's testimony is transcribed, at 155:24, as referring to the "post USS call world"—this actually is a reference to the small boat explosive attack on the USS Cole.

actively escorting usually with the coast guard [sic] or another law enforcement or military unit.").

Willard delivered the Vessel for a sea trial ("Sea Trial") on March 21, 2014. DSOF ¶ 7. Five (5) individuals were present for the Sea Trial: Officer Hryniewich, Plaintiffs, and two additional City employees, Sergeant Edwin Pagan (Hryniewich's immediate supervisor) and Lieutenant Timothy Evans. DSOF ¶ 5. At all relevant times, Hryniewich was employed by the City of Norfolk as a police officer. DSOF ¶ 1. During the Sea Trial, he acted on behalf of the City, was in uniform, and was on duty. Id. ¶ 4. Plaintiffs were both employed by Willard. Doc. 96 at 4-7 ("PSOF") ¶ 1. Prior to the Sea Trial, City representatives informed Willard that Hryniewich would be the individual operating MARINE 5 during the Sea Trial. Id. ¶ 2. Accordingly, during the Sea Trial Officer Hryniewich selected the maneuvers, chose the course and speed of the Vessel in each test maneuver, and was responsible for evaluating the handling of the Vessel. DSOF ¶ 9.

For the first runs of the Sea Trial, Hryniewich was in the operator's seat at the Vessel's helm on the starboard side of the cabin, Lt. Evans was next to him in the port front seat, Glover was directly behind Lt. Evans on the port bench seat, and Pridemore was standing just outside the cabin's rear door on the Vessel's aft deck. DSOF ¶ 7. Hryniewich conducted a full throttle, high-speed straight run shortly after performing slower-speed turns. PSOF ¶ 14. According to Plaintiffs, this was outside of the acceptable "break-in procedures" for new engines. PSOF ¶ 15.[4] Pridemore advised Hryniewich that he was breaking protocol. PSOF ¶ 16.

As the Sea Trial continued, Hryniewich identified what he perceived to be steering issues with the Vessel and expressed those concerns to others aboard the Vessel. DSOF ¶ 10. He

---

[4] Hryniewich argues that this fact is irrelevant. However, the Court does not yet have sufficient information about the cause of the accident to determine its relevance.

described the steering as "very tight" and more difficult than usual to pull out of a turn when the Vessel "had some speed on." DSOF ¶ 11; PSOF ¶ 17. He also expressed concerns that the Vessel's handling was different from his usual experience, and he was not sure if the Harbor Patrol's one female officer would have sufficient arm strength to operate the Vessel effectively. Id. Hryniewich and Sgt. Pagan discussed Hryniewich's observations in the presence and hearing of Glover. DSOF ¶ 12. According to Glover, Hryniewich told him the steering felt "different" during the Sea Trial, and "hard to pull out of [a] turn." Glover Dep. 61:7-62:20, Doc. 91-3. Glover responded that the boat would feel different because Willard had increased the horsepower of the engines and repaired the steering system. Id.

The only turns conducted by Defendant Hryniewich prior to identifying the issues with the steering system were slow speed turns while not having the boat on plane. PSOF ¶ 18. Defendant Hryniewich did not check the engines or steering system after identifying the steering issues. PSOF ¶ 19. Sgt. Pagan suggested that Hryniewich test the Vessel's steering with a series of high speed turns. DSOF ¶ 14. Two SBI employees testified that vessels like MARINE 5 are capable of taking a turn at full throttle under certain circumstances. Lohse Dep. 72:1-4 ("I wouldn't say that we made the hardest turn we could . . . but inevitably we did hard turns because the boats do it and that's thrilling."), Doc. 91-8; id. 111:25-112:15 ("[W]hen you're initiating [a J-turn], you're always at full throttle. . . It's never taught that way. . . It's what you're comfortable with at the time."); Peterson Dep. 94:19-21 (stating that high-speed turns could be done or entered at or near full throttle "at certain times"), Doc. 91-9. At the time of the Sea Trial, Hryniewich was not aware of any prior capsize incidents involving SAFE Boat vessels. DSOF ¶ 23. Hryniewich told Glover he planned to attempt a high-speed turn, and Glover did not object. DSOF ¶ 15. Prior to turning

the Vessel, Hryniewich asked Pridemore to come inside the boat due to "safety concerns."[5] DSOF ¶ 17; Hryniewich Dep. 59:18-60:6, Doc 91-1; Pridemore Dep. 39:7-20; 48:8-50:20, Doc. 91-4. He explained that this was because the MARINE 5 "turns very hard." DSOF ¶ 18. Officer Hryniewich then warned the others aboard to "hold on", and then attempted a turn to starboard, at which time the Vessel capsized. DSOF ¶ 19; PSOF ¶¶ 20, 24.

Plaintiffs were injured when the Vessel capsized. Comp. ¶ 12; City's Answer ¶ 12. They were treated in local hospitals and suffered pain as a result of their injuries. Id. Plaintiffs contend that the Accident was a result of Officer Hryniewich's negligent operation of the Vessel during the Sea Trial. Compl. ¶¶ 11, 14, 16-17. Plaintiffs contend that the City, as Officer Hryniewich's employer, is vicariously liable to them for Officer Hryniewich's alleged negligence. Id. at ¶¶ 13-14, 17.[6]

**B.    Hryniewich's Motion Legal Standard and Analysis**

Defendant Hryniewich moves for summary judgment, asserting qualified immunity for Plaintiffs' claims. See Doc. 91. The parties dispute the appropriate standard for such immunity under maritime law and whether Hryniewich's conduct would meet the relevant standard. Hryniewich argues that he is entitled to summary judgment because: (1) Plaintiffs have failed to allege a constitutional or statutory violation, as required by the qualified immunity standard of 42 U.S.C. § 1983 ("Section 1983"), and (2) even if that requirement is waived, Plaintiffs have not shown that Hryniewich was "plainly incompetent," a standard previously endorsed by this Court.

---

[5] The parties dispute whether Pridemore advised against the turn and requested to be let off the Vessel at this time. PSOF ¶ 22; Doc. 85 at 5 n.4. Hryniewich insists he did not hear such a statement. Hryniewich Dep. 64:3-66:24, 67:9-69:2. The other City Employees do not recall such a statement. Doc. 70 at Ex. 2, 52:10-53:4 (Sgt. Pagan); id. at Ex. 10, 48:3-9 (Lt. Evans).

[6] Officer Hryniewich is immune to Plaintiffs' claims against him. See Section III. B of this Order; This finding has been held in the State Actions as well. see Pridemore v. Hryniewich, Case No. CL16-3261, Ltr. Op. (Norfolk Cir. Ct. Oct. 9, 2019), Doc. 144-1; Pridemore, Final Order (Norfolk Cir. Ct. Oct. 25, 2019), Doc. 144-2.

Id.

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Groves v. Comm'n Workers of Am., 815 F.3d 177, 180 (4th Cir. 2016). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the factfinder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

Qualified immunity is a common law doctrine that "strikes a balance between two key societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017) (quoting

Pearson v. Callahan, 555 U.S. 223, 231 (2009)). For the violation of federal rights by government officials, courts generally evaluate qualified immunity under the framework established by Section 1983. Under that provision, qualified immunity "shields federal and state officials from [civil] money damages" unless a plaintiff establishes "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). For immunity to attach, a government official must have been acting within the scope of his employment and performing a discretionary function during the alleged conduct. See Anderson v. Creighton, 483 U.S. 635, 638–39 (1987); In re Allen, 119 F.3d 1129 (4th Cir. 1997). The qualified immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (quotations omitted).

*i. Plaintiffs Need Not Allege a Constitutional or Statutory Violation*

The parties first contest whether Plaintiffs must show that they have suffered a constitutional or statutory violation, as is typically required to defeat sovereign immunity under the Section 1983 framework. This Court has previously held that pleading a constitutional violation is ill-suited to the maritime tort context. See Doc. 60 at 14.

First, the conventional test for qualified immunity under Section 1983 fails to address the positive federal rights afforded by maritime tort law. Section 1983 generally does not impose liability when government officials violate duties of care arising from tort law. Baker v. McCollan, 443 U.S. 137, 146 (1979). This is because it is intended to vindicate federal rights, and as a "general rule," there are only "three bodies of federal positive law – the Constitution; federal statutes, rules, and regulations; and treaties." Gamble v. United States, 139 S. Ct. 1960, 1985

(2019). However, admiralty law is an exception to this rule, serving as one of the few arenas in which federal common law governs. Id. at 1984. Federal maritime law provides substantive rights and remedies for maritime torts, including negligence. State of Md. Dep't of Nat. Res. v. Kellum, 51 F.3d 1220 (4th Cir. 1995). It appears that Section 1983 has not yet been adapted to this address this unique body of federal positive law, where a plaintiff "may clearly allege injury but find it difficult to attach that injury to the violation of a particular constitutional right or statute." Doc. 60 at 14.

Second, the federalism concerns protected by Section 1983 do not apply in the admiralty context. Courts require a clear constitutional or statutory violation to overcome qualified immunity under Section 1983, in part to preserve a balance of power "whereby state governments retain authority over conventional tort remedies." Safar, 859 F.3d at 251. Indeed, the Constitution is a "blunt[] instrument" by which to formulate tort duties that govern everyday life. Id. However, maritime torts present a distinctly federal issue. "When a federal court decides a maritime case, it acts as a federal 'common law court,' much as state courts do in state common-law cases." Air & Liquid Sys. Corp. v. DeVries, 139 S. Ct. 986, 992–93 (2019) (citing Exxon Shipping Co. v. Baker, 554 U.S. 471, 489 (2008)). This is because federal courts have an interest in ensuring "all operators of vessels on navigable waters are subject to uniform rules of conduct." Foremost Ins. Co. v. Richardson, 457 U.S. 668, 675 (1982) (emphasis in original). Therefore, while traditionally, "the definition of legal duties under the law of tort is best left for the state courts to resolve," Safar, 859 F.3d at 251, tort duties imposed by maritime law are the province of federal courts. See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 259 (1979) ("Admiralty law is judge-made law to a great extent"); Romero v. International Terminal Operating Co., 358 U.S. 354, 360–361 (finding a constitutional grant "empowered the federal courts . . . to continue the development

14

of [maritime] law"). Accordingly, the need to restrict a plaintiff's cause of action to constitutional or statutory violations is unnecessary in an admiralty case, where federal courts are equipped to address statutory and tort claims alike.

Admittedly, the few courts that have addressed qualified immunity in the context of maritime torts, including this Court, have done so under the traditional Section 1983 framework. See Rabenstine v. Nat'l Ass'n of State Boating Law Adm'rs, Inc., No. 4:14CV78, 2015 WL 3470191, at *1 (E.D. Va. June 1, 2015) (granting summary judgment on a maritime tort claim for a plaintiff's failure to allege a constitutional or statutory violation); Harrell v. U.S., 875 F.2d 828 (11th Cir. 1989) (making conclusory statement that the "same considerations" apply to constitutional torts and non-constitutional maritime torts); Hoefling v. City of Miami, 876 F. Supp. 2d 1321, 1331 (S.D. Fla. Cir. 2012) (applying Harrell); Sol v. City of Miami, 776 F. Supp. 2d 1375 (S.D. Fla. 2011) (same); but see Yacht Sales Intern., Inc. v. City of Va. Beach, 977 F. Supp. 408, 412 (E.D. Va. 1997) (assessing qualified immunity based on the discretionary-ministerial framework used for federal officials who commit state law torts). However, it appears that the appropriate standard for qualified immunity in maritime torts was not directly at issue in those cases. Moreover, at least one of those courts acknowledged the shortcoming of a conventional approach. Sol, 776 F. Supp. 2d at 1381 n.5 (observing the 1983 framework "is not perfectly suited to address non-constitutional maritime tort cases, but it will have to do."). Here, Plaintiffs have presented persuasive reasons for adopting a different standard for qualified immunity in maritime tort cases.

### ii. The Discretionary-Ministerial Test Should Apply

Because the Section 1983 framework is unsuited to maritime torts, the Court must determine the appropriate standard for qualified immunity. This Court previously suggested that

Hryniewich would not be entitled to qualified immunity if he was "plainly incompetent." Doc. 60 at 14. Indeed, the Supreme Court has applied the "plain incompetence" standard on several occasions in the context of constitutional violations. See, e.g., Messerschmidt, 565 U.S. at 546; Stanton v. Sims, 571 U.S. 3 (2013). However, the Court is persuaded that a "plain incompetence" standard, in the absence of a constitutional violation requirement, would effectively eviscerate the qualified immunity defense.

The "touchstone" of the "plain incompetence" analysis is "objective legal reasonableness." Anderson, 483 at 640. Therefore, a qualified immunity defendant must typically establish that his conduct was reasonable considering available information and clearly established law. Id. at 641. However, a failure to act reasonably is inherent in the tort of negligence. See Black's Law Dictionary (11th ed. 2019) (defining "negligence" as "the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation."). Therefore, a "plain incompetence" standard for qualified immunity, absent the need for a clearly-established constitutional or statutory violation, would be indistinguishable from simple negligence. Such a test would not afford the heightened protection intended by the doctrine.

For the reasons mentioned above, the Court will adopt the common law approach to governmental immunity. Courts have granted qualified immunity to government officials who commit state torts while performing a discretionary function. See, e.g., Barr v. Matteo, 360 U.S. 564, 569–73 (1959) (plurality opinion); Westfall v. Erwin, 484 U.S. 292, 295 (1988); see Yacht Sales, 977 F. Supp. at 412 (applying the discretionary function test to a federal maritime tort claim). However, "discretionary function" immunity is only afforded to "the extent that the public benefits obtained by granting immunity outweigh its costs." Mangold v. Analytic Servs., Inc., 77 F.3d 1442, 1447 (4th Cir. 1996). For example, in Westfall v. Erwin, the Supreme Court recognized that

"official immunity comes at a great cost. An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by a federal official." 484 U.S. at 295. It therefore advised:

> In deciding whether particular governmental functions properly fall within the scope of absolute official immunity, . . . courts should be careful to . . . consider whether the contribution to effective government in particular contexts outweighs the potential harm to individual citizens.

Id., 484 U.S. at 299–300. The same considerations are implicated when state officials commit federal maritime torts.

The parties do not dispute that Hryniewich was performing a discretionary function in his official capacity at the time of the alleged tort. Pursuant to the principles established in Westfall, whether Hryniewich is entitled to qualified immunity will thus depend on whether the harm caused by such immunity outweighs its promotion of the "effective administration of . . . government." Boyle v. United Techs. Corp., 487 U.S. 500, 523–24 (1988). Here, the negligent operation of marine vessels does not appear to promote such purposes. Nevertheless, public harm resulting from a decision to grant qualified immunity is likely minimal, given the "general principle" that sovereign immunity does not bar a suit against a municipal corporation in admiralty. See N. Ins. Co. of New York v. Chatham Cty., Ga., 547 U.S. 189, 193–94 (2006). On balance, the Court **FINDS** that qualified immunity is appropriate where, as here, a city employee commits a maritime tort while performing a discretionary function in the scope of his employment. Accordingly, the Court **GRANTS** Hryniewich's Motion for Summary Judgment.

**C. City's Motion Legal Standard and Analysis[7]**

The City on summary judgment contends its motion should be granted for two reasons. See Doc. 153 at 1. First, the City avers that it cannot be vicarious liability for the actions of Officer Hryniewich because he is entitled to federal qualified immunity. See id. at 1. Second, the City argues that it is entitled to sovereign immunity in the "limited context" of performing port security operations. See id. at 2.

*i. Qualified Immunity and Vicarious Liability*

Here, the City requests a ruling that under the general maritime law the City cannot be held vicarious liable for acts in which its agent is entitled to qualified immunity. The Supreme Court has highlighted that "the general maritime law is an amalgram of traditional common-law rules, modifications of those rules, and newly created rules" drawn from state and federal principles. East River S.S. Corp. v. Transamerical Delaval, Inc., 476 U.S. 858, 864-65 (1986). The common law doctrine of respondeat superior has been consistently incorporated into the general maritime law. Workman v. New York City, 179 U.S. 552, 565 (1900) (noting that "under the general maritime law, where the relation of master and servant exists, an owner of an offending vessel committing a maritime tort is responsible, under the rule of respondeat superior, is elementary."); see In re M/V MSC Flaminia, 2015 AMC 2233 (S.D. N.Y. 2015); Washington v. Fieldwood Energy, LLC, 2017 AMC 2031 (E.D. La. 2017) (analyzing that the "borrowed servant doctrine" may apply to make an employer liable for the negligence of a borrowed employee). On the narrower issue presented here, there is no well-established principle of maritime law regarding the effect of an employee's qualified immunity on an employer's vicarious liability. With no clear guidance from the general maritime law, courts will often supplement state law. See Yamaha

---

[7] See Section III.B for the legal standard governing summary judgment.

Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 207 (1996) (noting the proposition that state law may be used to supplement federal maritime law so long as state law is "compatible with substantive maritime policies"); Elevating Boats, Inc. v. Gulf Coast Marine, Inc., 766 F.2d 195, 198 (5th Cir. 1985).

The case of Schubert v. August Schubert Wagon Co. 164 N.E. 42 (N.Y. 1928), was one of the seminal cases that discussed the effect of immunity on vicarious liability. See Sundance Cruises Corp. v. Am. Bureau of Shipping, 799 F. Supp. 363, 390 (S.D.N.Y. 1992) (noting that Schubert is "one of the seminal cases establishing U.S. law in this area."). Chief Judge Cardozo writing in the context of interspousal immunity highlighted that "[a] trespass, negligent or willful, upon the person of a wife, does not cease to be an unlawful act, though the law exempts the husband from liability for the damage. Others may not hide behind the skirts of his immunity." Id. at 391 (quoting Schubert). The rule was stated in the Restatement of the Law of Agency and is now incorporated in the Restatement (Second) of Agency § 217, which articulates that a "principal has no defense because of the fact that: . . . (ii) the agent had an immunity from civil liability as to the act." Restatement (Second) of Agency § 217 (Am. Law Inst. 1958); see Sundance Cruises Corp.,799 F. Supp. at 391. The citations to the Restatement continually highlight the proposition that "where the agent has an immunity from civil liability dependent on his or her peculiar status (as for example a family relationship to the injured party, official immunity of some sort or other, infancy, incompetence, etc.) subsection (b) applies and the principal *cannot* avail itself of its agent's defense." Sundance Cruises Corp.,799 F. Supp. at 391; see Babcock v. State, 809 P.2d 143, 156 (Wash. 1991) (en banc) (collecting cases that hold that "immunities of governmental officials do not shield the governments which employ them from tort liability, even when liability is predicated upon respondeat superior."). Therefore, under these common principles, the Court **FINDS** that

"municipalities are not shielded by the immunities of their agents." <u>Babcock,</u> 809 P.2d at 156

(citing <u>Owen v. Independence</u>, 445 U.S. 622 (1980)).[8]

Here, Hryniewich was found to be entitled to federal qualified immunity. A granting of

qualified immunity is legally distinct from an adjudication on the merits that the agent was

negligent. <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528 (1985). ("Similarly, it follows from the

recognition that qualified immunity is in part an entitlement not to be forced to litigate the

consequences of official conduct that a claim of immunity is <u>conceptually distinct</u> from the merits

of the plaintiff's claim that his rights have been violated.") (emphasis added). Accordingly,

qualified immunity serves as an immunity from having to litigate and therefore is not a finding

that the agent of the government was not negligent. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 672 (2009)

(citing <u>Mitchell</u>, 472 U.S. at 526); <u>see</u> <u>Gray-Hopkins v. Prince George's County</u>, 309 F.3d 224,

229 (4th Cir. 2002). The City asserts that Virginia law serves as persuasive authority that "the

exoneration of the agent also exonerates the principal." <u>Id.</u> at 153 at 7. The cases cited by

Defendant expounded that "where master and servant are sued together in tort, and the master's

liability, if any, is solely dependent on the servant's conduct, a verdict for the servant necessarily

exonerates the master." <u>Roughton Pontiac Corp. v. Alston</u>, 372 S.E.2d 147, 149 (Va. 1988).

---

[8] <u>Owen</u> highlights that:

> the official, whose liability is at issue. At the heart of this justification for a qualified immunity for the individual official is the concern that the threat of *personal* monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy. The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed. First, as an empirical matter, it is questionable whether the hazard of municipal loss will deter a public officer from the conscientious exercise of his duties; city officials routinely make decisions that either require a large expenditure of municipal funds or involve a substantial risk of depleting the public fisc. More important, though, is the realization that consideration of the <u>municipality's</u> liability for constitutional violations is quite properly the concern of its elected or appointed officials. Indeed, a decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates and did not weigh the risk that a violation might result in an award of damages from the public treasury.

<u>Owen v. Independence</u>, 445 U.S. 622, 655-56 (1980) (citations omitted).

However, Virginia law has never held that this principle applies "to claims against an employer when the employee was dismissed with prejudice on a plea in bar or other procedural matter." Huges v. Doe, 639 S.E.2d 302, 304 (Va. 2007). In the case of Hughes v. Doe, the Supreme Court of Virginia ruled that a dismissal with prejudice based on a plea in bar "was not an affirmative finding of non-negligence; it merely terminated Hughes' [Plaintiff] ability to hold Lucas [Employee] liable for any alleged negligence." Hughes, 639 S.E.2d at 304. The Court held that the dismissal "precluded Hughes from pursuing her claim against Pratt [Employer] for Lucas' negligence on a theory of respondeat superior." Id. Therefore, under Virginia law "a dismissal with prejudice based on a plea in bar extinguishes the viability of the claim against the dismissed party, it does not do so based on the merits of the claim." Id. As previously noted, qualified immunity is an affirmative defense similar to the dismissal in the case of Hughes and not an adjudication on the merits. Accordingly, the City cannot avoid respondeat superior liability where its agent is entitled qualified immunity.

### ii. Sovereign Immunity

The City contends that it is entitled to immunity, irrespective of Officer Hryniewhich immunity. The Court has previously denied the City's Motion for Judgment on the Pleadings on the grounds that the City is not entitled to sovereign immunity. There, the City argued that it was entitled to sovereign immunity despite the general rule that "[t]he bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances ... but does not extend to counties and similar municipal corporations." Doc. 60 at 8. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). In that Order, the Court further reasoned that the United States Supreme Court's decision in Workman v. New York, 179 U.S. 552 (1900), which held "that the City of New York could not claim sovereign immunity as to the

negligence of its fire department," precludes a finding for the City of Norfolk. Id. The Court

highlighted that there is simply "no way for the City to get around the Workman holding, nor the

Supreme Court's later decision upholding Workman." Id. (citing Northern Ins. Co. v. Chatham

Cty., 547 U.S. 189, 196 (2006) ("Workman dealt only with the substantive law of admiralty

precisely because the Workman Court held that admiralty courts have jurisdiction over municipal

corporations."); Workman, 179 U.S. at 565 ("[A]s a general rule, municipal corporations, like

individuals, may be sued; in other words . . . they are amenable to judicial process for the purposes

of compelling performance of their obligations.")). The reasoning behind the Court's previous

order is still persuasive on summary judgment. The Supreme Court's decision in Northern

Insurance stands firmly on the principle that "this Court's recognition of preratification sovereignty

as the source of immunity from suit is that only States and arms of the State possess immunity

from suits authorized by federal law." Northern Ins. Co. v. Chatham Cty., 547 U.S. 189, 193 (2006)

(citing Mt. Healthy City Sch. Dist. Bd. of Educ., 429 U.S. at 280). [9] Therefore, under the facts

presented here, the Supreme Court from 1900 to 2006 has consistently "applied the general

principle that sovereign immunity does not bar a suit against a city to an admiralty suit." Northern

Ins. Co., 547 U.S. at 193 (citing Workman, 179 U.S. at 570). To maneuver around Workman, the

City argues that the situation here is factually distinct because the City of Norfolk Harbor Patrol

was operating as an arm of the state at the time of the capsize.

    As an exception to the general rule, the City may be entitled to immunity under the

Eleventh Amendment if determined to be "an arm of the state." Ristow v. South Carolina Ports

Auth., 58 F.3d 1051, 1052 (4th Cir. 1995) (citing Mt. Healthy City Sch. Dist. Bd. of Educ., 429

U.S. at 280); see Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391,

---

[9] In its previous order on the City's Motion for Judgment on the Pleadings, the Court held that the City is not an arm of the state. See Doc. 60 at 10.

401 (1979) (highlighting that the Supreme Court "has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'"") When determining arm of state status, there are six useful factors for the Court to consider. The Court should weigh:

> (1) the characterization of the entity by the language of its creating statutes; (2) the origin of the entity's funding; (3) whether the state is financially responsible for the liabilities and obligations incurred by the entity; (4) the source of the power to appoint the entity's officers or members; (5) whether the function performed by the entity is traditionally state or municipal; and (6) whether the entity's actions are subject to a veto by the state.

Ristow, 58 F.3d at 1052 (citing Lake Country Estates, Inc., 440 U.S. at 401). Despite the six factors, the Court has highlighted "that one factor dominates the inquiry - whether the state treasury is 'obligated' for 'the losses and debts' of the entity under scrutiny." Ristow, 58 F.3d at 1052 (quoting Hess v. Port Authority Trans-Hudson, 513 U.S. 30, 49 (1994)). This is because the "'impetus' for the Eleventh Amendment is 'the prevention of federal court judgments that must be paid out of a state's treasury.'" Ristow, 58 F.3d at 1052 (quoting Hess, 513 U.S. at 49, 51 (highlighting if the state treasury is not impacted by the losses and debts of the enterprise "then the Eleventh Amendment's core concern is not implicated.").

In weighing the factors, the Court has previously noted the City's admission that "any judgment entered against the City here would not be paid by the Commonwealth . . . ." Doc. 60 at 10. Therefore, the most important factor in the inquiry does not weight in favor of the City. Despite this finding, the City claims "that the terrorist attacks of September 11, 2001, caused federal and state authorities to make the policy judgment that municipal police forces like the City's should be enlisted to support state and federal maritime security operations directly." Doc. 153 at 18. In addition, it avers that the purchase of the Vessel and the upgrades to it, which is the subject of the case, were funded through a federal grant program established by "United States Department of

Homeland Security pursuant to 46 U.S.C. § 70107" and that the Commonwealth of Virginia contributes funds to "every marine patrol unit in the Tidewater region." Id. (citing Va. Code § 28.2-108 (2016)). However, this Court has already found that the "[t]he fact that the repairs to and sea trial of the vessel in question were funded through a federal grant does not threaten or implicate state sovereignty in any way." Doc. 60 at 9. This is also true with the Commonwealth of Virginia. Accordingly, the Court previous conclusions in its Judgment on the Pleadings Order, support a finding that, on summary judgment, the City is not an arm of the state and is not entitled to Eleventh Amendment sovereign immunity.

As previously noted, the City attempts to persuade the Court that the situation and rationale behind the Workman case, decided nearly 120 years ago, have drastically altered that the Supreme Court's decision should be abandoned or distinguished. Doc. 153 at 2. The City avers a compelling argument that the City is entitled to immunity because it should be treated the same as its state and federal counterparts in performance of the task of port security. Id. at 13 (noting that "[t]he Coast Guard and DGIF [Virginia Department of Game and Inland Fisheries] also would be in similar positions under the maritime law, as well: both agencies would be immune from maritime tort claims, except to the extent that the legislature of their respective sovereign has expressly chosen to waive that immunity. Even though it is engaged in the exact same activity, for the same purpose, and using the same federal funds" as the City of Norfolk). The Court understands the City contentions that "it makes no sense for maritime law to bear more harshly on the City in its performance of a national security role, than on the Navy, Coast Guard, or state agencies doing the same thing." Id. at 15. Additionally, the City argues that "Workman should be abandoned not only because it no longer fits the fundamentally altered circumstances obtaining on the waterfront, but also because it failed in its central purpose." Id. The Supreme Court in Workman declined to

24

follow New York law because it would result in a lack of clear uniformity in the rules of sovereign immunity as applied to maritime law. Workman, 179 U.S. at 558 (noting that if the Court was to follow New York law than immunity would be "one thing in one state and one in another; one thing in one port of the United States . . . .").[10] The City argues the Workman rationale is no longer supportable because courts have inconsistently applied immunity to state port authorities. See Doc. 153 at 16 (collecting cases where the courts have come to differing conclusions regarding the application of Eleventh Amendment immunity to port authorities). Therefore, the City contends that because Workman has not achieved its primary purpose - it should be abandoned.

Even if the City's arguments are determined to have merit, it is not the duty of a trial court to abandon binding Supreme Court precedent in favor of the City's rationale. See Hutto v. Davis, 454 U.S. 370, 375 (1982) (noting a precedent of [the Supreme Court] must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.) The maritime rule, articulated in Workman and Northern Insurance, that municipalities are not entitled to sovereign immunity is applicable to the facts before the Court. Accordingly, the Court **DENIES** the City's Motion for Summary Judgment.

---

[10] The Supreme Court's rational of a uniform maritime law is based on the fact that

the power to change state laws or state decisions rests with the state authorities by which such laws are enacted or decisions rendered, it would come to pass that the maritime law affording relief for wrongs done, instead of being general and ever abiding, would be purely local -- would be one thing to-day and another thing to-morrow. That the confusion to result would amount to the abrogation of a uniform maritime law is at once patent. And the principle by which the maritime law would be thus in part practically destroyed would besides apply to other subjects specially confided by the Constitution to the Federal government. Thus, if the local law may control the maritime law, it must also govern in the decision of cases arising under the patent, copyright and commerce clauses of the Constitution. It would result that a municipal corporation, in the exercise of administrative powers which the state law determines to be governmental, could with impunity violate the patent and copyright laws of the United States or the regulations enacted by Congress under the commerce clause of the Constitution, such as those concerning the enrollment and licensing of vessels.

Workman, 179 U.S. at 558.

## IV. HRYNIEWICH MOTION FOR RES JUDICATA

As noted in the previous section, the Court **GRANTS** Hryniewich's Motion for Summary Judgment on the grounds that Office Hryniewich is entitled to federal qualified immunity. Doc. 90. Therefore, this favorable ruling for Hryniewich on the issue of federal qualified immunity now renders Hryniewich's Motion for Res Judicata moot. Accordingly, the Court **DENIES** Hryniewich's Motion for Res Judicata as **MOOT**.

## V. SBI'S MOTIONS

SAFE Boats International, LLC ("SBI") has four outstanding motions:

- Motion for Summary Judgment, Doc. 99;
- Motion to Exclude Third-Party Plaintiffs' Expert, Doc. 92;
- Motion to Withdraw as Attorney, Doc. 151;
- Motion to Amend / Correct Scheduling Order to Extend Deadline for De Bene Esse Depositions, Doc. 160.

First, James L. Johnsen, an attorney representing SBI at the law firm at Crenshaw, Ware & Martin P.L.C, has left the firm effective November 28, 2019. The Court **FINDS** that SBI is still represented by Crenshaw, Ware & Martin and no party will be prejudiced by Mr. Johnsen's withdrawal. Accordingly, the Court **GRANTS** the Motion to Withdraw as Attorney as to Mr. Johnsen. Second, at the hearing on January 15, 2020, the Court heard argument on the Motion to Amend / Correct Scheduling Order to Extend Deadline for De Bene Esse Depositions. For good cause shown, the Court **GRANTED** the Motion at that time. SBI is permitted to take the de bene esse deposition of Mr. West in a manner and at a time to be agreed upon by the parties. Third, in the interest of judicial economy, because City Defendants request contribution and/or indemnity against SBI for their potential liability to Plaintiffs, it is premature to resolve SBI's Motion for Summary Judgment and Motion to Exclude before interlocutory appeal on immunity. At this time,

the Court **RESERVES RULING** on both SBI's Motion to Exclude and Motion for Summary Judgment. Doc. 92, 99.

## VI.    WILLARD'S MOTIONS

In short, because City Defendants request contribution and/or indemnity against Willard for their potential liability to Plaintiffs, it is inappropriate to decide Willard's motions before resolution of the underlying facts giving rise to liability.  See, e.g., Builders Mut. Ins. Co. v. Futura Grp., L.L.C., 779 F. Supp. 2d 529, 534 (E.D. Va. 2011) ("If there is . . . the need for a subsequent determination of the narrower question of whether there is a duty to indemnify, it will likely be necessary for this Court to await the outcome of the state court suit before making the duty to indemnify determination.").  After the underlying tort claim is resolved at trial, City Defendants may proceed against Willard.

Therefore, the Court **RESERVES RULING** on Willard's Rule 14 Motion for leave and Willard's Rule 19 Motion to add a fourth-party defendant, Starr Indemnity and Liability Company ("Starr").[11]  Joining Starr before the Court establishes liability in the underlying tort claim would violate Virginia policy on insurer liability.  See Va. Code § 8.01-5 ("Nothing in this section shall be construed to permit the joinder of any insurance company on account of the issuance to any party to a cause of any policy or contract of liability insurance, or on account of the issuance by any such company of any policy or contract of liability insurance for the benefit of or that will inure to the benefit of any party to any cause."); see also United Services Auto. Ass'n v. Nationwide Mut. Ins. Co., 241 S.E.2d 784, 788 (Va. 1978) ("[I]n Virginia, an injured person must reduce his claim to judgment before bringing an action against the tort-feasor's liability insurer.").

---

[11] Willard has filed a Motion for Leave to File a Fourth Party Complaint, Doc. 67, and, in the alternative, a Motion to Add a Necessary Party, Doc. 69.

Accordingly, the Court may consider adding Starr to the instant case after the interlocutory appeal has been resolved.

## VII. CITY's MOTION TO STAY

The City moves to stay the case pending its appeal on immunity. The City avers two separate theories for a stay. First, the City argues that the case must be stayed because the filing of the City's interlocutory appeal will deprive the court of subject matter jurisdiction to proceed with trial. Doc. 168 at 3. Second, the City contends that even if this Court determines that it has jurisdiction to proceed with trial, it "should impose a discretionary stay because of all the factors for evaluating a discretionary stay weight in favor" of granting one. Id. at 6.

### A. Mandatory Stay of Proceedings Pending Immunity Appeal

In Mitchell v. Forsyth, 472 U.S. 511 (1985), the Supreme Court of the United States held that "orders denying individual officials' claims of absolute and qualified immunity are among those that fall within" the collateral order doctrine outlined in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949). The Court identified that "absent immediate appeal, the central benefits of qualified immunity -- avoiding the costs and general consequences of subjecting public officials to the risks of discovery and trial - would be forfeited . . . ." Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 143-44 (1993) (citing Forsyth, 472 U.S. at 526). Thus, qualified immunity is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. at 144 (quoting Forsyth, 472 U.S. at 526); see Gray-Hopkins v. Prince George's County, 309 F.3d 224, 229 (4th Cir. 2002) (noting that "qualified immunity is an immunity from having to litigate, as contrasted with an immunity from liability"). The party asserting immunity is pleading their right "not to endure the cost and travail of trial . . . ." Apostol v. Gallion, 870 F.2d 1335, 1338

(7th Cir. 1989). Therefore, allowing trial to proceed while interlocutory appeal is pending essentially "destroys rights created by the immunity." Id.

Here, "the City sought summary judgment on the basis of sovereign immunity." Doc. 168 at 2. The successor to Forsyth, Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., has extended the Forsyth holding to the context of sovereign immunity. There, the Court held "that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." Puerto Rico Aqueduct & Sewer Auth., 506 U.S. at 147. The Court affirmed that "the value to the States of their Eleventh Amendment immunity, like the benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice." Id. at 145; see Madison v. Virginia, 474 F.3d 118, 129 n. 2 (4th Cir. 2006) (highlighting the principle from Puerto Rico Aqueduct & Sewer Auth that immunity is "effectively lost if a case is erroneously permitted to go to trial"). Since, "trial is inextricably tied to the question of immunity . . . it makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one." Eckert Int'l v. Government of Sovereign Democratic Republic of Fiji, 834 F. Supp 167, 174 n.12 (E.D. Va. 1993); see Apostol, 870 F.2d at 1338.[12]

The City's main argument for a stay is that "the filing of the interlocutory appeal will immediately vest jurisdiction over these questions in the Fourth Circuit . . . ." Doc. 168 at 5. The Supreme Court in Griggs held that "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously." Griggs v. Provident Consumer

---

[12] The Supreme Court has "identified just four categories of appeals in which the values at stake created a right not to be tried: claims to (1) absolute immunity, Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); (2) qualified immunity, Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); (3) Eleventh Amendment sovereign immunity, Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144–145, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); and (4) the protections of the Double Jeopardy Clause, Abney v. United States, 431 U.S. 651, 660, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977)." South Carolina State Bd. Of Dentistry v. Federal Trade Commission, 455 F.3d 436, 444 (4th Cir. 2006).

Discount Co., 459 U.S. 56, 58 (1982); United States v. DeFries, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (including the application of Griggs to interlocutory appeals). Griggs held that "the notice of appeal 'divests the district court of its control over those aspects of the case involved in the appeal.'" Apostol, 870 F.2d at 1338 (quoting Griggs 459 U.S. at 58). Since immunity is a defense not to stand trial, proceeding to trial is clearly an aspect of the case implicated in appellate review. As a result, "courts have concluded that at least as to those claims for which qualified immunity has been claimed, the district court may not proceed to trial while the interlocutory appeal is pending." Carrington v. Duke Univ., No. 1:08CV119, 2011 U.S. Dist. LEXIS 156404, *8 (M.D.N.C. June 9, 2011).[13] An appeal denying sovereign immunity, like qualified immunity, therefore "divests the district court of jurisdiction (that is, authority) to require the appealing defendants to appear for trial." Apostol, 870 F.2d at 1338.

Plaintiffs contest that "there simply is no immunity for the Defendant, a municipality, and this has been the established law for 120 years." Doc. 180 at 8. The Court notes that the Supreme Court's clear decisions in Workman and Northern Insurance that the City is not entitled to sovereign immunity. However, the general principle that immunity is a defense from trial encourages that the appellate court should have the opportunity to determine if the City's changed

---

[13] Sovereign immunity and qualified immunity both implicate the right not to stand trial. Here is a collection of cases supporting the rationale that a court should not continue to trial while an interlocutory appeal on qualified immunity is pending. See Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir. 1989) (noting that in an interlocutory appeal on qualified immunity grounds, "[w]hether there shall be a trial is precisely the 'aspect[] of the case involved in the appeal,'" and such an appeal "divests the district court of jurisdiction (that is, authority) to require the appealing defendants to appear for trial"); Stewart v. Donges, 915 F.2d 572, 574 (10th Cir. 1990) (holding that "the defendant's interlocutory appeal . . . based on qualified immunity divested the district court of jurisdiction to conduct a trial"); Walker v. City of Orem, 451 F.3d 1139 (10th Cir. 2006) (holding that during an interlocutory appeal of a motion to dismiss on qualified immunity grounds, the district court was divested of jurisdiction to proceed even as to summary judgment determinations); see also Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985) (noting that where a qualified immunity defense is raised, defendants have an "entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law"); Gray-Hopkins v. Prince George's County, 309 F.3d 224, 229 (4th Cir. 2002) (noting that "qualified immunity is an immunity from having to litigate, as contrasted with an immunity from liability"); Cloaninger v. McDevitt, 555 F.3d 324, 330 (4th Cir. 2009).

circumstances merit a departure from the <u>Workman</u> holding.[14] The proposition that a "sovereign immunity defense is 'both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation'" support that this case should not proceed while an interlocutory appeal on immunity is pending. <u>White v. Chapman</u>, No. 1:14CV848, 2015 WL 13021744, at *2 (E.D. Va. Apr. 29, 2015) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 622, 672 (2009)). Therefore, the Court **FINDS** that it lacks jurisdiction to proceed to trial during the pendency of the City's interlocutory appeal.[15] <u>See</u> <u>White</u>, No. 1:14CV848, 2015 WL 13021744, at *2 (ruling two weeks before trial that the "entire case is stayed so that [Defendant] may make an interlocutory appeal to the Fourth Circuit on the question of whether he is entitled to sovereign immunity"). Due to this holding, the Court need not consider the City's alternative argument for a discretionary stay. Accordingly, the Court **GRANTS** the City's Motion for a Stay.

### VIII. CONCLUSION

For the reasons stated herein, the Court **CONSOLIDATES** the cases for all further proceedings. Furthermore, the Court **RULES** as follows on the remaining motions: (1) **GRANTS** Hryniewich's Motion for Summary Judgment; (2) **DENIES** the City's Motion for Summary Judgment; (3) **DENIES** Hryniewich's Motion for Res Judicata as **MOOT**; (4) **RESERVES RULING** on SBI's Motion for Summary Judgment; (5) **RESERVES RULING** on SBI's Motion to Exclude; (6) **GRANTS** SBI's Motion to Withdraw as Attorney; (7) **GRANTS** SBI's Motion to Amend / Correct Scheduling Oder to Extend Deadline for De Bene Esse Depositions; (8)

---

[14] Here, the facts tied to an immunity determination are undisputed. Therefore, the question on appeal is one of application of <u>Workman</u> and <u>Northern Insurance</u> to the presented facts. <u>See</u> <u>Al Shimari v. CACI Intern., Inc.</u>, 679 F.3d 205, 221-22 (4th Cir. 2012) (noting that the Court of Appeals may consider and rule on "an interlocutory appeal of a denial of immunity . . . of . . . an ostensibly fact-bound issue that may be resolved as a matter of law (such as whether facts that are undisputed or viewed in a particular light are material to the immunity calculus) . . . .").

**RESERVES RULING** on Willard's Rule 14 and 19 Motions; (9) **GRANTS** the City's Motion to Stay. The Case is hereby **STAYED** until further order of the Court.

The Clerk is **REQUESTED** to deliver a copy of this Order to all counsel of record.

It is so **ORDERED**.

_____/s/_____
Henry Coke Morgan, Jr.
Senior United States District Judge

_____
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February _____, 2020