IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DAVID I. GLOVER )
                 )
    and )
                 )
TIMOTHY B. PRIDEMORE, )
                 )
    Plaintiffs, )
                 )
    v. )          Civil Action No. 2:17CV109 (RCY)
                 )
RICHARD J. HRYNIEWICH, )
                 )
    and )
                 )
THE CITY OF NORFOLK, VIRGINIA, )
                 )
    Defendants and )
    Third-Party Plaintiffs, )
                 )
    v. )
                 )
SAFE BOATS INTERNATIONAL, LLC, )
                 )
    and )
                 )
WILLARD MARINE, INC., )
                 )
    Third-Party Defendants. )
_____ )

**MEMORANDUM OPINION**

This matter is before the Court on Third-Party Defendant Safe Boats International, LLC's

Motion for Summary Judgment (ECF No. 221) on all counts of the Third-Party Complaints filed

against it (ECF Nos. 27, 29).  The motion has been briefed, and the Court dispenses with oral

argument because the facts and legal contentions are adequately presented in the materials before

the Court, and oral argument would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).

For the reasons stated herein, the Court will DENY Safe Boats' Motion for Summary Judgment.

## I. FACTUAL ALLEGATIONS[1]

In 2007, the City of Norfolk ("the City") purchased a vessel, Marine 5, from Safe Boats

International, LLC ("Safe Boats") to use in maritime security operations.  (Def. Hryniewich's

Third-Party Compl. Safe Boats ¶¶ 5-8, ECF No. 27.)  In 2014, the City contracted with Willard

Marine, Inc. ("Willard Marine") to replace Marine 5's twin 250 horsepower engines with twin 300

horsepower engines and to replace the steering system so that the vessel could reach maximum

speed.  (Def. City's Third-Party Compl. Willard Marine ¶¶ 5-8, ECF No. 28; Def. Hryniewich's

Third-Party Compl. Safe Boats ¶ 20, ECF No. 27.)[2]  The contract with Willard Marine ("Contract")

also called for Willard Marine to conduct a sea trial "with [a] NHP representative" (*id*.  ¶¶ 9, 14),

with the promise that if the City's employees were satisfied with the vessel's performance, they

would accept delivery of the vessel on behalf of the City.  (*Id*. ¶14.)  A sea trial is a specialized

tactical endeavor to test the capabilities of a vessel.  It is meant to be performed in a systematic,

progressive fashion.  (Mem. Supp. Mot. Summ. J. ¶ 18, ECF No. 222.)

Willard Marine delivered the vessel for a sea trial on March 21, 2014.  Five individuals

were present for the sea trial: Officer Hryniewich, Sergeant Pagan, and Lieutenant Evans on behalf

of the City, and Plaintiffs Glover and Pridemore on behalf of Willard Marine.  (Pl. Compl. ¶¶ 7-8,

ECF No. 1; Mem. Supp. Mot. Summ. J. ¶ 16.)  At all relevant times, Officer Hryniewich remained

employed by the City as an officer with the Norfolk Harbor Patrol, and remained on duty and in

---

[1] The Court also incorporates by reference the undisputed facts set forth in *Glover v. Hryniewich*, 438 F. Supp. 3d 625, 631-33 (E.D. Va. Feb. 7, 2020).  Only the facts pertinent to this specific motion for summary judgment are produced herein.

[2] There are four Third-Party Complaints in this action, each made by one Third-Party Plaintiff against one Third-Party Defendant.  (*See* ECF Nos. 26-29.)

uniform throughout the sea trial.  (*Id.* ¶ 4.)  Before the sea trial, representatives from the City informed Willard Marine that it had selected Hryniewich to operate Marine 5 during the sea trial. (Glover Dep.  53:1-11, ECF No. 91-3.)[3]

After the sea trial commenced, Officer Hryniewich observed what he believed to be a steering and handling issue with the vessel and expressed those concerns to others aboard.  (Pl. Compl. ¶¶ 10-11.)  He described the steering as "very tight" and expressed concern that the handing of the vessel was different from his usual experience.  Glover responded that the boat would feel different because Willard Marine had increased the horsepower and repaired the steering systems.  (Glover Dep.  61:7-62:20.)  After receiving this reassurance from Glover, Officer Hryniewich did not check the engines or steering system further.  (*Id.*)  Despite his concerns and his observation that Marine 5 "turns very hard" (City Opp. Summ. J. 9, ECF No. 231), Officer Hryniewich proceeded to push the vessel to a high speed and made a hard turn.  (Pl. Compl. ¶ 11.)  Prior to making this sharp turn at a high speed, the Officer warned others aboard to "hold on" and asked Pridemore, who was expressing concern, to move inside the boat for safety reasons.  (Pl. Compl. ¶ 11; Answers ¶ 11, ECF Nos. 18, 19; Pl. Opp. Mot. Summ. J. 5, ECF No. 227.)  The vessel then capsized and all those on board were thrown into the water.  (Pl. Compl. ¶ 12.)  Plaintiffs Glover and Pridemore sustained serious injuries and were transported to local hospitals.  (*Id.*)

---

[3] Except where referencing depositions, the Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.  Because different segments of several individuals' depositions are found throughout the record, CM/ECF numbers are included where the location of the transcript is unclear.

## II. PROCEDURAL HISTORY[4]

Plaintiffs Glover and Pridemore filed separate complaints on February 23, 2017.  (ECF No. 1; Pl. Compl., *Pridemore v. Hryniewich et al.*, No. 2:17cv110 (E.D. Va. Feb. 23, 2017), ECF No. 1.)

The City and Office Hryniewich filed Third-Party Complaints against both Willard Marine and Safe Boats on October 31, 2017.  (ECF Nos. 26, 27, 28, 29.)  The Third-Party Complaints against Safe Boats sought indemnity and contribution from Safe Boats in the event that Defendants were found liable to Plaintiffs.  (ECF Nos. 27, 29.)  Defendants' Third-Party Complaints against Safe Boats alleged claims for general maritime products liability, strict products liability, breach of express warranty, breach of the implied warranty of merchantability, and, in the alternative, breach of implied fitness for a particular purpose.  (ECF Nos. 27, 29.)  Safe Boats filed an Answer to each Third-Party Complaint on January 2, 2018, denying liability on all counts.  (ECF Nos. 50, 51.)

On April 1, 2021, the case was reassigned to the undersigned.  Safe Boats filed a Motion for Summary Judgment on September 28, 2018.  (ECF No. 99.)  The Motion was originally taken under advisement on November 21, 2019.  (ECF No. 150.)  On April 1, 2021, noting that the Motion was filed in 2018 and that "circumstances may have changed significantly since then," the Court dismissed the Motion without prejudice.  (ECF No. 206.)  Safe Boats filed a second Motion for Summary Judgment on October 18, 2021 (ECF No. 221).  Responses were filed (ECF Nos. 227, 231), and replies were filed (ECF Nos. 228, 233).  Magistrate Judge Lawrence Leonard issued

---

[4] The Court also incorporates by reference the procedural history set forth in the Memorandum Opinion issued on January 7, 2022.  *Glover v. Hryniewich*, 341 F.R.D. 36 (E.D. Va. 2022).

4

an opinion granting Safe Boats' Motion to Exclude Third-Party Plaintiffs' Expert Rik van Hemmen on March 3, 2022. (ECF No. 261.) Thereafter, Safe Boats filed a Supplemental Brief in support of its Motion for Summary Judgment (ECF No. 270), and the City filed a Response (ECF No. 271) to the Supplemental Brief.

### III. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide the standard for this matter. Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). The evidence must be viewed "in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

Although the court must draw all reasonable inferences in favor of the nonmoving party, in order to defeat a motion for summary judgment, that nonmovant cannot rely on "mere belief of conjecture, or the allegations and denials contained in his pleadings." *Doyle v. Sentry Ins.*, 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### IV. DISCUSSION

The City and Officer Hryniewich each seek indemnity and contribution, should they be found liable, from Safe Boats based on five counts: Maritime Law Products Liability (Count I), Strict Products Liability (Count II), Breach of Express Warranty (Count III), Breach of Implied Warranty of Merchantability (Count IV), and in the alternative to Count IV, Breach of Implied

Fitness for a Particular Purpose (Count V).[5]  (ECF Nos. 27, 29.)  Responding to each of these counts, Safe Boats alleges that Officer Hryniewich operated Marine 5 as a borrowed servant of Willard Marine at the time of the sea trial, thus rendering Hryniewich a fellow servant of the Plaintiffs and barring tort suit through the Longshore and Harbor Workers Compensation Act.  As a result, according to Safe Boats, there is no tort liability from which Defendants and Third-Party Plaintiffs can seek indemnity.  (Mem. Supp. Mot. Summ. J. 20.)  Further, Safe Boats argues that, under the active-passive negligence theory of indemnity, the City cannot seek indemnity from Safe Boats if the City itself is an active tortfeasor.  (*Id*. 24.)  Safe Boats maintains that the City's selection of Officer Hryniewich to operate the vessel during the sea trial despite his relative inexperience with sea trials and the vessel in question constitutes a form of active negligence.  (*Id*. 26.)

### A. Longshore and Harbor Workers Compensation Act

The Longshore and Harbor Workers Compensation Act (hereinafter "LHWCA"), 33 U.S.C. § 905, serves as a compensation scheme for persons killed or injured in the course of, and arising out of, maritime employment.  Where applicable, the LHWCA operates in lieu of tort damages, and grants the employer immunity from tort liability regardless of the seriousness of fault.  Although Section 905(a) provides that the LHWCA is the exclusive means of achieving compensation from an employer, Section 905(b) specifically provides injured employees the right to sue a vessel for negligence.  In order to trigger the exclusivity provision of Section 905(b), the injured worker (1) must be employed to provide shipbuilding, repairing, or breaking services, and (2) the defendant must be his employer and the owner, owner pro hac vice, agent, operator, or charterer of the vessel or a fellow employee of that employer.  1 Thomas Schoenbaum, *Admiralty*

---

[5] The Court has determined that Officer Hryniewich is protected by qualified immunity due to his status as a City employee performing a discretionary function in the scope of his employment.  *See* ECF No. 189.

& *Maritime Law* § 7:14 (6th ed. 2021).  *See also Price v. Atlantic Ro-Ro Carriers, Inc.*, 262 F. Supp. 3d 289, 292 (D. Md. 2017); *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96 (1994).

Here, Glover and Pridemore have brought a suit as a third parties, pursuant to Section 905(b), against the Defendants City of Norfolk and Hryniewich as the vessel's owner and the owner's employee while also suing the Defendants for negligence and gross negligence in separate causes of action arising under general maritime law.

### 1. Engagement in Ship Repair

In order for a Section 905(b) suit against the vessel to be barred, the two provisions enumerated above must be met.  Safe Boats fails to address the first prong of the exclusivity test in its memorandum in support of its motion for summary judgment (ECF No. 222).  Plaintiffs, noting that omission, argue that the first prong of the test is not satisfied because a genuine issue of material fact exists as to whether Plaintiffs are ship repairers.  Pl. Opp. Mot. Summ. J. 11. Plaintiffs argue that they did not fall under any of the employment categories outlined in Section 905(b), pointing out that the Fifth Circuit has adopted a definition of repair that means "to restore to a sound or healthy state" and not to merely modify or improve. (*Id*. 12 (citing *New v. Associated Painting Services, Inc.*, 863 F.2d 1205, 1209 (5th Cir. 1989).)  However, other cases enjoy a more expansive view.  Contracts for vessel repairs are considered maritime contracts, while contracts for original construction are not.  *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961); *The Jack-O-Lantern*, 258 U.S. 96, 99 (1922).  Despite this distinction, contracts regarding the installation of new parts or the overhaul of systems on already constructed vessels are considered maritime.  *See, e.g.*, *Little Beaver Enters. v. Humphreys Rys, Inc.*, 719 F.2d 75 (4th Cir. 1983) (applying admiralty law to a contract for the installation of a new steering system on a vessel).  More specifically, contracts to replace engines in already constructed vessels are considered maritime contracts.  *See,*

*e.g.*, *Jo Ann B., Inc. v. Carter Machinery Co., Inc.*, No. 97-2133, 1998 WL 957456, at *1-3 (4th Cir. Sept. 22, 1998) (applying maritime law to a contract for the rebuilding of a ship's engine); *Southworth Mach. Co. v. F/V COREY PRIDE*, 994 F.2d 37, 40-41 (1st Cir. 1993) (finding that maritime law applies to a contract for the sale and installation of an engine in a commercial vessel); *Booth S.S. Co. v. Meier & Oelhaf Co.*, 262 F.2d 310, 311-13 (2d Cir. 1958) (concluding that the interpretation of a contract to overhaul engines was governed by admiralty law); *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 896 F. Supp. 2d 582, 595 (S.D. Tex. 2012) ("Contracts for repair, alteration, conversion, or reconstruction of a vessel which, previous to such work, was actively engaged in maritime commerce or navigation generally are considered maritime contracts."); *Todd Marine Enterprises, Inc. v. Carter Mach. Co.*, 898 F. Supp. 341 (E.D. Va. 1995) (finding that a contract for the installation of new engines was a maritime contract because it was essential to the operation of a ship as a maritime vessel). Although increasing Marine 5's horsepower is not the mending of a flaw per se, the evidence supports that such a modification was necessary to restore vessel to its most useful purpose.

The parties do not dispute that the City of Norfolk entered into the Contract with Willard Marine to refit Marine 5, and that Willard Marine replaced Marine 5's twin 250-hp engines with twin 300-hp engines, and replaced her steering system and two of her crew seats. Specifically, among other things, the Contract called on the vendor to "remove old motors and rigging[;] . . . supply and install new motors[;] . . . install new control cable, ignition switch, harnesses, and multifunction gauge[;] . . . [r]eplace steering cylinders on both outboards[;] . . . [and] [p]erform sea trial." (Contract 5-6, ECF No. 37-1.) While the Contract does not explicitly state that Marine 5 was previously launched in water, the Contract does suggest so by stating that the vessel was a 2007 model and the City of Norfolk sought to "replace existing Yamaha engines currently

powering" the boat. (*Id.* at 4).)  Furthermore, the Contract requires the installation of Yamaha engines to ensure "consistency of performance with other boats in the Harbor Patrol Unit." (*Id.*) Depositions taken in this matter also revealed the Norfolk Harbor Patrol used vessels like Marine 5 to assist U.S. Navy vessels and that the "City chose to upgrade the Vessel's engines specifically to enhance its performance in its vessel escort mission." *Glover v. Hryniewich*, 438 F. Supp. 3d 625, 631-32 (E.D. Va. Feb. 7, 2020) (summarizing depositions).

Taken together, these facts suggest that Marine 5 was an already constructed boat that had previously been launched into water by the City of Norfolk and that the Contract at issue was not to construct a new vessel but rather to update the boat by replacing its outdated engines to allow it to perform its duties in an improved manner.  This Contract for the installation of new engines on an already constructed vessel mirrors the marine contracts in the cases aforementioned. *See, e.g.*, *Todd Marine Enterprises, Inc.*, 898 F. Supp. at 343.  The Contract to replace the engines on Marine 5 did not render it "an essentially different vessel," but rather operated like a repair that still "preserve[d] the identity of the vessel." *The Jack-O-Lantern*, 258 U.S. at 99.  Therefore, the Plaintiffs and their employer were indeed engaged in ship repair, satisfying the first prong of the LHWCA § 905(b) exclusivity provision.

### 2. The Borrowed Servant Doctrine

The "borrowed servant" doctrine provides a means to determine which of two employers, the usual or general employer versus the borrowing employer, should be held liable for the tortious acts of an employee when that employee was in the general employ of one employer while performing tasks for the borrowing employer. *NVR, Inc. v. Just Temps, NC.,* 31 F. App'x 805, 807 (4th Cir. 2002) (citing *Standard Oil v. Anderson,* 212 U.S. 215, 220 (1909) ("When an attempt is made to impose upon the master liability for [the servant's tortious acts], it sometimes becomes

necessary to inquire who was the master at the very time of the negligent act or omission.")). Although the LHWCA does not explicitly adopt the borrowed servant doctrine, the word "employer" in 33 U.S.C. § 905(a) includes both general employers and employers who "borrow" a servant from that general employer. *White v. Bethlehem,* 222 F.3d 146, 149 (4th Cir. 2000). A person can be in the general employ of one organization while simultaneously being in the particular employ of another "with all the legal consequences of the new relation." *Id.* (quoting *Standard Oil*, 212 U.S. at 220). To determine whether an employee is a borrowed servant, a factfinder must ascertain who holds the power to control and direct the servant in the performance of their work. *Standard Oil*, 212 U.S. at 221-22. The authority of the borrowing employer need not extend to every incident of the employment relationship, but it must encompass the servant's performance of the particular work that led to the alleged tort. *White v. Bethlehem*, 222 F.3d at 149. If the borrowing employer possesses this authoritative direction or control over the particular act leading to the cause of action, it assumes the legal position of the employer. When this occurs, the LHWCA provides the exclusive remedy for the employee. *Ladd v. Research Triangle Institute*, 335 F. App'x. 285, 288 (4th Cir. 2009).

In its Motion for Summary Judgment, Safe Boats asserts that at the time of the accident, Officer Hryniewich was operating Marine 5 as a borrowed servant of Willard Marine, thus rendering the LHWCA the exclusive remedy for the Willard Marine-employed Plaintiffs. (Mem. Supp. Mot. Summ. J. 20.) If the Court were to adopt Safe Boats' contention that the LHWCA provides the sole remedy for Plaintiffs, neither the City nor Officer Hryniewich would have any liability for which they could seek contribution or indemnity from Safe Boats. Because the extent of authority granted to Willard Marine is unclear, the Court finds that there remain in dispute several issues of material fact regarding the application of the borrowed servant doctrine to the

relationship between Officer Hryniewich and Willard Marine. Due to this finding, Safe Boats is not entitled to summary judgment on any counts in the Third-Party Complaint based on this argument.

In determining whether the borrowed servant doctrine applies, the factfinder must distinguish between the borrowing employer's ability to exercise authoritative direction and control, and its exercise of "mere suggestion as to details or the necessary cooperation." *Standard Oil*, 212 U.S. at 222. In this case, it is unclear whether the Contract governing the sea trial between Willard Marine and the City conferred Willard Marine with sufficient authority over the movements and discretion of Officer Hryniewich for the Officer to be a borrowed employee. The Fourth Circuit offered several factors that inform the question of whether a borrowing employer maintains authoritative direction and control over the borrowed worker. These factors include the supervision of the employee, the ability to unilaterally reject the services of an employee, the payment of wages or benefits either directly or indirectly, and the duration of employment. *White v. Bethlehem*, 222 F.3d at 149. No party alleges that Willard Marine, the alleged borrowing employer, paid or offered to pay wages and benefits to Officer Hryniewich, nor is the duration of the employment particularly prolonged or involved. The remaining disputes concern the nature of Willard's supervision over Officer Hryniewich and its ability to reject the Officer's services.

While Glover and Pridemore did offer instruction to Officer Hryniewich throughout the sea trial, factual disputes remain as to whether the direction they offered was authoritative and whether the Contract between the City and Willard Marine conferred such authority. Safe Boats claims that the Contract between Willard Marine and the City indicates a temporary employment relationship for purposes of the sea trial. The Contract term in question appears as one item in a list of items describing the scope of Willard Marine's work for the City. It simply reads, "Perform

11

sea trial with NHP representative." (Contract 7, ECF No. 15-2.)  The Contract, however, did not

name or request Officer Hryniewich.  In an email sent the day before the sea trial, the City, through

Sgt. John Poch of the Harbor Patrol Unit, informed Willard Marine that Officer Hryniewich would

be the NHP representative operating Marine 5 during the sea trial.  (Glover Dep. 53:1-11.)  The

sergeants of the Harbor Patrol Unit selected Officer Hryniewich for this task, and Sgt. Pagan

informed him that he would be operating the boat.  *Id*.  The record indicates that Officer

Hryniewich's primary employer, the City, did not contemplate representatives from Willard

Marine operating the vessel during the sea trial, and Willard Marine employees understood that

Officer Hryniewich's operation of Marine 5 was a departure from standard procedures.  (Pl. Opp.

Summ. J. 14-15, ECF No. 227.)  Whereas Safe Boats asserts that the Contract secured Willard

Marine's power to direct and control the sea trial, the City's actions indicate that it understood the

relationship to be one of coordination rather than control.  (*See* Glover Dep. 53:8-55:8; Pagan Dep.

43:16-44:11, 52:10-53:4, ECF No. 91-2.)

Regardless of the parties' understanding, it remains unclear whether the nature of Willard

Marine's supervision of Officer Hryniewich was sufficiently direct and authoritative to meet the

threshold for a borrowing employer.  In *White v. Bethlehem Steel Corp.*, 22 F.3d at 150, a case

cited by all parties, the court found that White, a heavy equipment operator for construction

company Langenfelder, was a "borrowed servant" of Bethlehem Steel due to Bethlehem Steel's

maintenance of authority over him.  White, assigned to work at Bethlehem Steel by his primary

employer, "worked just as if he were a Bethlehem Steel employee."  *Id.*  Bethlehem Steel

supervised him over a near-uninterrupted twenty-six-year period, assigned him to the ships where

he would work, paid his wages and insurance in a pass-through form, and possessed the authority

to exclude him from the job site.  *Id.*  A preexisting contract indicating that Langenfelder would

maintain "exclusive direction, supervision, [and] control" over its workers failed to outweigh the evidence that White was a borrowed servant.  *Id*.  *See also Gaudet v. Exxon Corp.*, 562 F.2d 351, 357-59 (5th Cir. 1977) (affirming (1) the trial court's finding that Gaudet was a borrowed employee and (2) its granting summary judgment in favor of the borrowing employer despite a contract proclaiming the original employer would maintain control).  Thus, it is the actual evidence, rather than the language of the contract regarding the employee, that controls.  In the present case, the evidence before the Court indicates that Officer Hryniewich lacks most of the characteristics outlined by the Fourth Circuit in *White v. Bethlehem*.  The term for which Willard Marine might have exercised control over the Officer was a brief term of hours.  Sergeants of the Norfolk Harbor Patrol Unit, not Willard Marine representatives, selected Officer Hryniewich as the operator of the boat, with Hryniewich stating that his supervisor at NHP, Sergeant Pagan, directed him to take the helm at the sea trial.  (Hryniewich Dep. 36:24-37:16, ECF No. 96-3.)  Willard Marine did not pay, directly or indirectly, wages or benefits to the Officer (ECF No. 227); and while Willard Marine might have possessed some ability to request or demand another NHP representative for the sea trial, the extent of that authority is unclear from the record.

Safe Boats further argues that the Contract terms requiring Willard Marine to perform the trial "with" an NHP unit representative demonstrates that the representative was acting in the capacity of an employee.  (Mem. Supp. Mot. Summ. J. 22-23.)  The Court disagrees.  As it appears in the Contract, the word "with" is more commonly used to indicate a participant in an action, transaction, or arrangement.  *See With*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/with.  While it was customary for Willard Marine employees to operate the boats during sea trials, the record remains unclear as to whether the

Contract arrangement between Willard Marine and NHP was seen as a deviation from, or continuation of, that practice.  (Glover Dep. 37:1-17, ECF No. 222-6.)

Moreover, even if a party is deemed to be a borrowed servant of one employer, this does not automatically indicate that he is no longer the servant of the initial employer.  *Delozier v. S2 Energy Operating, LLC*, 491 F. Supp. 3d 149, 155-56 n.40 (E.D. La. 2020) (noting that "there can be more than one Jones Act employer," and that "the lending employer need not completely sever his relationship with the employee for another to be considered the employee's borrowing employer.")  Therefore, Officer Hryniewich's possible status as a borrowed employee of Willard Marine, by itself, may not release the City from all liability.

Accordingly, the Court finds that there remain genuine issues of material fact pertaining to the application of the borrowed servant doctrine with regard to the relationship between Officer Hryniewich and Willard Marine.  Due to this finding, Safe Boats is not entitled to summary judgment on any counts in the Third-Party Complaint based on the borrowed servant doctrine.

### B. Active-Passive Implied Indemnity Theory

Safe Boats argues that it is entitled to summary judgment because the Defendants "may not transfer their own active negligence liability to Safe Boats under the active-passive negligence implied indemnity theory."  (Mem. Supp. Mot. Summ. J. 24.)  In admiralty law, the active-passive implied indemnity theory allows for a party guilty of only passive, secondary, or implied fault to transfer ultimate liability to a party guilty of active or primary fault. *Vaughn v. Farrell Lines, Inc.*, 937 F.2d 953, 957 (4th Cir. 1991).  Safe Boats contends that the Plaintiffs' claims against the Defendants are based only on the Defendants' active negligence.  (Mem. Supp. Mot. Summ. J. 25.)  But the Defendants point out the Plaintiffs' allegation that the City is vicariously liable for Officer Hryniewich's alleged negligence.  (City Opp. Summ J. 18.)

14

The issue is whether the active-passive theory applies here, and if so, whether a genuine issue of material fact remains about Defendants' or Safe Boats' active negligence.  Over time, the active-passive distinction has been held to be outmoded.  1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5:16 (6th ed. 2021).  Thus, tort indemnity is limited to cases where a non-negligent or vicariously liable tortfeasor is entitled to indemnity from a person or party guilty of actual fault. *Id.*

The record remains unclear as to Officer Hryniewich's and the City's negligence, and whether it was active, merely vicarious, or both.  Much of the evidence as to the negligence of the Defendants and Safe Boats is disputed.  There are genuine issues of material fact such that the Court cannot grant Safe Boats summary judgment based on this argument.

A reasonable factfinder could, but need not, find the City actively liable.  At all relevant times, Officer Hryniewich was employed by the City as a police officer.  Prior to the day of the sea trial, the City informed Willard Marine that Officer Hryniewich would operate Marine 5.  (Hyrniewich Dep. 36:21-37:1, ECF No. 96-3; Glover Dep. 52:23-53:11, ECF No. 96-5.)  The City does not dispute that, although Officer Hryniewich had attended two boat operator courses in his capacity as a City employee, he had never done a sea trial or received training specific to sea trial procedures.  (Mem. Supp. Mot. Summ. J. 9; City Opp. Summ. J. 6.)  (*See also* Hryniewich Dep. 11:11-15, ECF No. 103-11; Hryniewich Dep. 140:24-142:3, ECF No. 103-12.)  Hryniewich later testified that he had never operated a 27-foot Full Cabin model with a 300-horsepower engine, the exact model of vessel to be used in the sea trial.  (Hryniewich Dep. 187:23-188:1, ECF No. 103-12.)  Thus, the City assigned the Officer knowing that he lacked experience with the boat in question, and that he had never performed the task for which he was selected.

However, this evidence by itself is not dispositive of active negligence.  Although Officer Hryniewich lacked experience with piloting a 27-foot vessel with twin 300-horsepower engines, he had driven similar vessels in his capacity as an NHP officer.  (Mem. Supp. Mot. Summ. J. 15.) The City also asserts that many of Officer Hryniewich's choices on the boat occurred after consultation with his supervisor, that Officer Hryniewich had completed multiple training courses on boatmanship, and that the Officer's mistakes were due to Safe Boats' inadequate warnings. (Hryniewich Dep. 36:8-37:1, ECF No. 231-4; Pagan Dep. 36:12-23, ECF No. 231-4; City Opp. Summ. J. 27.)  Due to the genuine issues of material fact regarding the nature of the City's and Safe Boats' liability, Safe Boats is not entitled to summary judgment on any counts in the Third-Party Complaint based on this argument.

### C. Counts I and II: Maritime Products Liability and Strict Products Liability

Safe Boats also argues that it is entitled to summary judgment on the Defendants' Third-Party Products Liability Claims, specifically Counts I and II.  (Mem. Supp. Mot. Summ. J. 26.) Then, in its Supplemental Brief, it argues that Judge Leonard's ruling excluding the City's proffered expert "now forecloses all of the City's product liability counts against Safe Boats." (Supp. Brief 1, ECF No. 270.)  The City disagrees, arguing that there is other admissible evidence regarding Safe Boats' liability under these counts.

The law of products liability, including negligence and strict liability, is a part of general maritime law.  *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865-66 (1986).  When applying admiralty law, absent a relevant statute, federal common law principles of admiralty supply the rule of decision.  *Id.* at 864.  *See also Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150, 157 (E.D.N.Y. 2006) (same).

16

A product can be unreasonably dangerous if it was negligently or defectively designed. *See Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *reh'g denied*, 522 F.2d 1280 (5th Cir. 1975); *Groves v. Royal Caribbean Cruises, Ltd.*, 463 F. App'x 837 (11th Cir. 2012).  It may also be unreasonably dangerous if the risks inherent in the product are greater than those a reasonable buyer would expect, and the likelihood and gravity of the harm outweigh the potential utility of the product.  *See* Restatement (Second) of Torts comment i, § 402A (1965); *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110 (5th Cir. 1982). However, to prove products liability for defective design, the plaintiff must not only show that the product did not operate properly, but that improper operation caused the injury in question.  *Santos-Rodriguez v. Seastar Solutions*, 858 F.3d 695 (1st Cir. 2017).

Liability may also be imposed on sellers and manufacturers who negligently fail to warn of a defect in design or construction where such defect is known to the manufacturer or seller, and they could have warned consumers and users of that risk.  *Krammel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir. 2000) (citing Restatement (Third) of Torts: Prod. Liab. § 2(c)).  There is no duty to warn a person with actual knowledge of the danger.  *See Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457 (5th Cir. 1976) (finding that a manufacturer was not liable for the death of a worker because the hazards associated with its chemical products were within the worker's knowledge and expertise).  Moreover, maritime law recognizes the "sophisticated user" defense to both negligent and strict liability failure to warn cases.  *See Mack v. General Elec. Co.*, 896 F. Supp. 2d 233 (E.D. Pa. 2012).  This defense holds that a manufacturer or supplier has no duty to warn an end user who is "sophisticated" regarding the hazards of the product.  *Id.*

The City's assertion that Safe Boats' vessels, and specifically Marine 5, suffered from a design defect falls short because it never specifies a defect, but instead presents an argument akin

to a failure to test or failure to warn claim.  However, there remain numerous disputes of material

fact regarding both the suitability of Safe Boats' warning, and the conduct of Officer Hryniewich.

First, while deviation from the ABYC's H-26 standard alone does not render Safe Boats'

vessels inherently and unreasonably dangerous, the utility and prevalence of the standard, and the

question of its use by Safe Boats, creates a disputed issue of fact as to whether Officer Hryniewich

could reasonably anticipate the risks associated with the vessel during a quick turn.[6]  (*See* Taylor

Dep. 37:5-22, ECF No. 231-24.)  H-26 is a generally accepted standard, and is currently the only

standard available that defines maneuvering tests and protocols.  (*Id.*)  It is unclear whether Safe

Boats used either the ABYC or a similar standard when testing its boats.  (*Id.* 31:5-13).  However,

the widespread use of this standard makes it plausible that a reasonable vessel operator would find

unusual Safe Boats' requirement that the engines be trimmed in completely prior to a high-speed

turn.

Next, Safe Boats' own actions might validate that a warning about the instability of the

boat under certain conditions could be necessary.  The City alleges that Safe Boats' representatives

aided in the production of a 2004 Coast Guard manual for its Defender class vessels that warns of

risks when making high speed turns (2004 Handbook 12-13, ECF No. 231-19), and again helped

draft a 2006 operator's handbook that specifies that the 25-foot full cabin vessel is likely to capsize

if turned with its engines in any configuration other than trimmed all the way in.  (City Opp. Summ.

J. 13-14.)  Although a later 2010 manual authored by Safe Boats appears to warn that high speed

turns while the boat is "improperly trimmed" may result in injury, it does not specifically indicate

what constitutes improper trimming.  (Safe Boats Reply 5, ECF No. 233.) Even if such a warning

was sufficient, Safe Boats required consumers to pay additional fees to access the instructions

---

[6] American Boat & Yacht Council (ABYC) is a non-profit organization that helps establish boat safety standards.

manual for the vessel in question, which the City opted against.  (City Opp. Summ. J. ¶¶ 21, 52.)  The parties disagree about the authorship of the 2004 and 2006 manuals, the level of the City's access to them, and the necessity of the warning itself.

Finally, the record is unclear about whether Officer Hryniewich had trimmed the engines properly before the accident.  Officer Hryniewich believes that he had trimmed the engines in prior to performing the maneuver that caused the boat to capsize.  (Mem. Supp. Mot. Summ. J. ¶ 25.)  If true, it would substantiate Safe Boats' argument that its lack of warning did not cause the accident in question.  However, the City insists that Officer Hryniewich's beliefs are incorrect, instead claiming that "the evidence establishes that . . . the engines were not trimmed all the way down at the time of the accident."  (City Opp. Summ. J. 28.)

Because there are disputed material facts, including whether the risk of capsizing is open and obvious, and whether the warnings in the manuals were sufficient, the Court denies summary judgment as to Counts I and II.

### D. Counts IV and V – Implied Warranty of Merchantability and Implied Warranty of Fitness for a Particular Purpose

The warranty provisions of the Uniform Commercial Code are fully applicable in admiralty and maritime law.  1 Thomas Schoenbaum, *Admiralty & Maritime Law* § 5:13 (6th ed. 2021).  *See also Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *reh'g denied*, 522 F.2d 1280 (5th Cir. 1975); *Lykes Bros. Steamship Co. v. Waukesha Bearings Corp.*, 502 F. Supp. 1163 (E.D. La. 1980).  Contract law allows parties to negotiate allocation of risk through disclaimers to certain warranties.  Per UCC Section 2-316, the implied warranty of merchantability may be disclaimed in a written contract through a conspicuous disclaimer that either: (1) expressly identifies "merchantability" or (2) includes an expression that goods are sold "as is" or "with all faults."  While it is easier to assign risk through disclaimers in commercial

transactions, courts are much slower to allow parties to disclaim risks for personal injury under tort law.  *2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1186 (4th Cir. 1986).  However, when sophisticated parties knew or should have known about the inherent risks of a product, courts have found that a disclaimer to an implied warranty may also cover personal injuries.  *Buettner v. Super Laundry Machinery*, 857 F. Supp. 471, 477 (E.D. Va. 1994) (finding that an injured but sophisticated third-party plaintiff should have known about a disclaimed implied warranty, and thus the disclaimer was not unconscionable).  Both gross disparity in bargaining power and gross negligence are grounds for avoiding a disclaimer. Schoenbaum, *Admiralty & Maritime Law* § 5:13; *Lykes Bros. Steamship Co.*, 502 F. Supp. at 1172.

In its Motion for Summary Judgment and memorandum filed in support (ECF Nos. 221, 222), Safe Boats did not directly address Counts III, IV, and V, except to assert without specifics that it was entitled to summary judgment on those claims based on the borrowed servant and active-passive theories.  Safe Boats only partially addressed these counts in its reply to the City's Opposition to Summary Judgment, giving the City insufficient means to respond.  After Magistrate Judge Leonard granted the parties leave to file supplemental briefings in response to the Court's exclusion of expert witness Rik van Hemmen, Safe Boats again merely mentioned Counts IV and V in its Supplemental Brief without further explanation or detail.  (ECF No. 270.)  The City likewise failed to address Safe Boat's request for summary judgment on these counts in its response. (ECF No. 271.)  Without the necessary briefing from any party, the Court is unable to evaluate the merits of Safe Boats' Motion for Summary Judgment as it relates to Counts III, IV, and V.  Therefore, the Court will deny Safe Boats' Motion for Summary Judgment as to these counts as well.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Third-Party Defendant Safe Boats' Motion

for Summary Judgment.

An appropriate order shall issue.

                                               /s/ _____

                                      Roderick C. Young
                                      United States District Judge

Richmond, Virginia
Date: September 28, 2022